# United States Court of Appeals
### For the Eighth Circuit

_____

No. 12-1138

_____

In re: Jeffrey Scott Unterreiner; Lisa Marie Unterreiner

*Debtor*s

------------------------------

The Samuel J. Temperato Revocable Trust

*Appellant*

v.

Jeffrey Scott Unterreiner; Lisa Marie Unterreiner

*Appellee*s

_____

Appeal from the United States Bankruptcy
Appellate Panel for the Eighth Circuit

_____

Submitted: September 19, 2012
Filed: November 8, 2012

_____

Before MELLOY and BENTON, Circuit Judges, and BAKER,[1] District Judge.

_____

[1]The Honorable Kristine G. Baker, United States District Judge for the Eastern District of Arkansas, sitting by designation.

MELLOY, Circuit Judge.

Jeffrey and Lisa Unterreiner (together, "the Unterreiners") filed for bankruptcy on October 30, 2006. The Samuel J. Temperato Revocable Trust ("the Trust") filed an Adversary Complaint against the Unterreiners, claiming the Unterreiners owed a nondischargeable debt to the Trust under 11 U.S.C. § 523. The Bankruptcy Court granted summary judgment to the Trust. The Bankruptcy Appellate Panel ("BAP") reversed, holding that the Trust was not entitled to judgment as a matter of law because the Trust could not meet the statutory requirements of 11 U.S.C. § 523. The Trust appealed. We affirm.

I.

Mr. Unterreiner and Ed Radetic[2] were sole shareholders of King William Management Company ("King William"). King William operated three Dairy Queen stores in Missouri. Dairy Queen of Greater St. Louis ("DQSTL") was the franchisor of King William's stores. The Trust owns DQSTL. Crest Oelke ("Oelke") was a trustee of the Trust. Oelke was also affiliated with DQSTL.

In December 2005, King William was in such poor financial shape that it could not continue to operate without a loan. Oelke arranged for Cass Bank ("Cass") to make a loan of $235,000 ("the loan") to King William. To secure the loan, the Unterreiners signed personal guarantees as well as a Commercial Security Agreement ("Security Agreement"). DQSTL also guaranteed the loan. The Unterreiners did not speak with Oelke, with anyone from the Trust, with anyone from Cass, or with anyone from DQSTL before signing the loan documents. Indeed, until the Trust filed its Complaint, the Unterreiners did not know the Trust owned DQSTL and did not even know the Trust existed.

---

[2]Neither Ed Radetic nor his wife is a party to this action.

The Security Agreement listed King William as borrower. The Security Agreement listed the Unterreiners and Ed Radetic and his wife as the guarantors. Finally, the Security Agreement listed "all business assets located at 1036 N. Sprigg Street, Cape Girardeau, MO 63701 and 31 S. Kingshighway, Cape Girardeau, MO 63703" as collateral.[3] Some four years before Cass made the loan to King William, the Trust had signed a separate agreement with Cass under which the Trust guaranteed all of DQSTL's obligations to Cass. However, the Trust was not mentioned in the Security Agreement and was not a guarantor of the King William loan, except in its capacity as a blanket guarantor of DQSTL.

Cass distributed the loan directly to DQSTL. DQSTL retained a portion of the loan as partial repayment of King William's outstanding debt to DQSTL under the franchise agreement and distributed the remainder of the loan to King William. Approximately a year after Cass distributed the loan, Mr. Unterreiner informed Cass that, contrary to statements in the Security Agreement, King William did not actually own most of the collateral. Thus, the Security Agreement contained a misrepresentation. The Unterreiners claimed they did not read the loan documents, including the Security Agreement, before signing.

King William defaulted on the loan in December 2007, and Cass pursued the Unterreiners on their guaranty. On June 20, 2008, Cass released the Unterreiners from any further liability on the loan in exchange for a payment of $20,000. Cass then made a demand on the Trust for payment of the outstanding balance of the loan.

On October 31, 2008, the Trust filed an Adversary Complaint against the Unterreiners. The Trust claimed the Unterreiners, as co-guarantors of the loan, owed

---

[3] 1036 N. Sprigg Street and 31 S. Kingshighway were evidently the locations of two of King William's Dairy Queen stores.

a debt to the Trust that was nondischargeable under 11 U.S.C. § 523.[4] The Trust claimed it had reasonably relied on the misrepresentation in the Security Agreement when it guaranteed DQSTL's obligations and when it allowed DQSTL to guaranty the loan. The Trust also alleged the Unterreiners knew the Security Agreement contained a misrepresentation at the time the Unterreiners signed the Security Agreement.

The Trust moved for summary judgment. The Bankruptcy Court found that DQSTL had reasonably relied on the Unterreiners' misrepresentation when DQSTL guaranteed the loan. The Bankruptcy Court held that the Unterreiners' obligation to the Trust was nondischargeable and granted summary judgment to the Trust.

The Unterreiners appealed, and the BAP reversed. The BAP held that the Trust could not fulfill the statutory requirements under § 523(a)(2)(B) to render a debt nondischargeable. The BAP concluded (1) the Unterreiners did not receive anything from the Trust when the Unterreiners made the misrepresentation; (2) the Trust could not have relied on the Security Agreement when it guaranteed DQSTL's obligations, because the Trust agreed to guaranty DQSTL's obligations years before Cass made the loan; and (3) any representations in the Security Agreement were made to Cass, not to the Trust. Finally, the BAP questioned, but did not decide, whether the Security Agreement qualified as a "writing respecting the debtor's financial condition."

## II.

"Summary judgment is appropriate when, viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Henning v. Mainstreet

_____

[4]After the Trust filed its Adversary Complaint, both the Trust and DQSTL settled their obligations on the loan with Cass.

Bank, 538 F.3d 975, 978 (8th Cir. 2008). "In an appeal from the BAP, this court independently reviews the bankruptcy court's decision, applying the same standard of review as the BAP. Fact findings by the bankruptcy court are reviewed for clear error; its conclusions of law are reviewed de novo." Terry v. Standard Ins. Co., 687 F.3d 961, 963 (8th Cir. 2012) (citations omitted).

11 U.S.C. § 523(a)(2)(B) excepts from discharge a debt

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - -
> . . . (B) use of a statement in writing - -
>     (i) that is materially false;
>     (ii) respecting the debtor's or an insider's financial condition;
>     (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>     (iv) that the debtor caused to be made or published with intent to deceive . . . .

"To prevail under § 523(a)(2)(B), the Plaintiff has to establish by a preponderance of the evidence" all elements of the statute. Jacobus v. Binns, 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005). We agree with the BAP that the Trust cannot establish all the elements. Specifically, the Trust cannot establish that the Unterreiners obtained money, property, services, or credit from the Trust, nor can the Trust establish that it relied on the Unterreiners' misrepresentation.

First, the Unterreiners did not receive "money, property, services, or an extension, renewal, or refinancing of credit" from the Trust when the Unterreiners made the misrepresentation. As the BAP stated:

> To succeed in having a debt excepted from discharge under § 523(a)(2), the creditor is required to prove that the debtors obtained money, property, services or an extension, renewal or refinancing of credit from it at the time of the misrepresentation. Marcusen v. Glen (In re Glen),

639 F.3d 530, 533 (8th Cir. 2011) (citing In re Dougherty, 179 B.R. 316, 322 (Bankr. M.D. Fla. 1995) ("In other words, the debtor himself must have obtained the money or property and he must have received it from the claimant."))[5] The representations in the [Security Agreement] were made to [Cass], not to the Trust, and the loan was made by [Cass], not by the Trust. Simply stated, Mr. and Mrs. Unterreiner did not receive any money or property from the Trust concurrent with the representation.

The Trust suggests the Unterreiners received the guaranty of DQSTL concurrent with the misrepresentation, but as the BAP pointed out, DQSTL is not a party to this action. Whether or not the guaranty of DQSTL falls within § 523(a)(2) is not at issue.

Second, the Trust cannot show it reasonably relied on the Unterreiners' misrepresentation when it guaranteed DQSTL's obligations. The Trust's liability for the loan arose from the Trust's blanket guaranty of DQSTL's obligations to Cass, not from the loan agreement. The Trust's blanket guaranty predated the loan by some four years. As the BAP noted, "[s]ince the Trust's guaranty was already in existence, it could not possibly have relied on the misrepresentations in the [Security Agreement]." Whether DQSTL relied on the Security Agreement in making its guaranty of the loan is not at issue because DQSTL is not a party to this action.

Since the Trust cannot meet at least two of the statutory requirements, we need not address the remaining requirements. We do not determine whether the Security Agreement was a statement "respecting the debtor's or an insider's financial condition." Furthermore, we need not review the additional issues of material fact the Unterreiners raise, including whether the Trust is a creditor to whom the Unterreiners

---

[5]Although Glen involved § 523(a)(2)(A), and not § 523(a)(2)(B), both sections share the requirement under subsection (2) that the debt be for "money, property, services or an extension, renewal, or refinancing of credit."

are liable and whether the Unterreiners made the misrepresentation with intent to deceive.[6]

### III.

The Trust is not entitled to judgment as a matter of law because it cannot meet all the requirements of § 523(a)(2)(B) to except a debt from discharge. The Unterreiners did not obtain money, property, or services from the Trust, and the Trust did not rely on the Unterreiners' misrepresentation when it guaranteed DQSTL's obligations. We affirm the BAP's ruling, vacate the award of summary judgment to the Trust, and direct judgment for the Unterreiners.

———————————————

———————

[6]We dismiss the Trust's argument that it may recover from the Unterreiners on the basis that "a guarantor who satisfies a judgment which has been rendered against other coguarantors jointly and severally, is subrogated to creditor's rights as judgment creditor against the other coguarantors." The Trust has not satisfied any judgment against the Unterreiners. We also dismiss the suggestion that the Trust may recover from the Unterreiners by standing in the shoes of Cass as a creditor. The Trust received no assignment from Cass. Moreover, even assuming the Trust could raise Cass's rights against the Unterreiners, Cass released the Unterreiners from any further liability for the loan—Cass has no surviving rights against the Unterreiners, so the Trust would have no rights to assert.